UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHY PESKIN, | ) | Case No.: 1:18 CV 336 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH AND FLORENCE MANDEL | ) | |
| JEWISH DAY SCHOOL, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Currently pending before the court in the above-captioned case is Defendant Joseph and Florence Mandel Jewish Day School ("Mandel JDS") and Defendant Jerry Isaak-Shapiro's ("Isaak-Shapiro") (collectively, "Defendants") Motion for Summary Judgment ("Motion") (ECF No. 18). For the reasons that follow, the court grants Defendants' Motion.

## I. BACKGROUND

**A.    Factual Background**

1. Employment with Mandel JDS

Plaintiff Kathy Peskin ("Plaintiff" or "Peskin") worked for Mandel JDS[1] on a series of one-year contracts from August 2006 through June 2015, first as the Director of Marketing and then as the Director of Public Relations. (Compl. ¶¶ 2, 5, ECF No. 1-2.) In her role as Director of Marketing, Peskin was "responsible for the overall marketing operations of the school, to both

---

[1]    Prior to 2015, Mandel JDS was named the Agnon School. (Peskin Decl. ¶ 3, ECF No. 24-1.) For simplicity, the court uses "Mandel JDS" to refer to the school during all time periods.

'internal' and 'external' constituencies." (Pl.'s Ex. 2 at PageID #852, ECF No. 18-2.) Peskin was expected to produce marketing materials for Mandel JDS; promote the school through various platforms, including local print media, electronic media, social media, and the Mandel JDS website; "assume a senior role" in the school's Senior Administrative Leadership Team ("SAL Team"); advise other SAL Team members regarding marketing matters; and provide a "visible and positive presence" in the Mandel JDS community. (*Id.* at PageID #852 53.) In June 2015, Mandel JDS changed Peskin's title to Director of Public Relations and reassigned most of her marketing responsibilities, particularly duties involving digital communications, to other staff members. (Defs.' Ex. E at PageID #870, ECF No. 18-2.)

Peskin reported directly to Mandel JDS Head of School, Isaak-Shapiro, for most of her tenure. During this time, Peskin's job performance generally was satisfactory. (*See* Isaak-Shapiro Dep. at PageID #186, ECF No. 17-1.) Mandel JDS reduced Peskin's hours and compensation to 80 percent for the 2009 2010, 2010 2011, and 2011 2012 school years due to economic conditions and budgetary constraints caused by the Recession. (*See* Peskin Dep. at PageID #95, ECF No. 17-4; *see also* Isaak-Shapiro Dep. at PageID #176 81, ECF No. 17-1; Defs.' Ex. A at PageID #804 06, ECF No. 18-1.) But Peskin returned to full employment and also received a salary increase at the start of the 2012 2013 school year. (*See* Peskin Dep. at PageID #589, ECF No. 17-4; *see also* Defs.' Ex. A at PageID #807.)

Starting in the fall of 2014, Peskin began reporting to Laura Leventhal ("Leventhal"), the Director of Institutional Advancement, after Mandel JDS restructured its administration. (*See* Peskin Dep. at PageID #589; Peskin Decl. ¶ 18, ECF No. 24-1.) Concerned about the changing marketing landscape and increasing importance of social media, Leventhal encouraged Peskin to boost her computer skills and competence with various software programs and communications platforms. (*See* Leventhal Decl. ¶ 11, ECF No. 18-2.) Leventhal repeatedly urged Peskin to complete computer

-2-

training courses to boost her efficiency and productivity. (*See* Defs.' Ex. C at PageID #856, ECF No. 18-2; Defs.' Ex. D at PageID #857, ECF No. 18-2; Defs.' Ex. G at PageID #858, ECF No. 18-2; Ex. 2D at PageID #861, ECF No. 18-2.) During check-ins with Peskin and in follow-up emails, Leventhal identified classes that satisfied Peskin's needs, confirmed that the school would cover any costs, and explained that Peskin could complete the required training during the workday. (*See* Peskin Dep. at PageID #630 31, 698, ECF No. 17-4.)

    2. Performance Issues and Transition to Director of Public Relations

In June 2015, Leventhal and Isaak-Shapiro decided to "realign [Peskin's] position" due to concerns with her performance. (Isaak-Shapiro Decl. ¶ 10, ECF No. 18-1.) Leventhal confirmed this change in an email to Peskin on June 25, 2015, which explained Leventhal was "formally reassigning much of what would normally fall under Marketing and Digital/Electronic Communication in acknowledgment that these are not your areas of proficiency." (Defs.' Ex. E at PageID #870, ECF No. 18-2.) As a result, Peskin's hours, salary, and benefits were reduced to 80 percent. (*Id.* at PageID #871.) Although Leventhal and Isaak-Shapiro initially offered Peskin her choice of title between Public Relations Associate or Public Relations Specialist, Peskin ultimately received the title Director of Public Relations. (*See id.*; Defs.' Ex. A at PageID #810 11, ECF No. 18-1.) In addition to these changes, Leventhal placed Peskin on a 90-day Performance Improvement Plan ("PIP") identifying various expectations, goals, and deadlines. (Defs.' Ex. F, ECF No. 18-2; *see also* Leventhal Dep. at PageID #479, ECF No. 17-3.)

Although the parties dispute the timing and extent of Peskin's performance issues, the following facts are undisputed.[2] Starting in the fall of 2014, Leventhal began emphasizing the need

---

    [2]     According to Issak-Shapiro, for example, it had become clear by mid-2014 that Peskin "was not continuing to grow in the position of Director of Marketing and/or obtaining the skills necessary to remain effective in the position," especially with regard to social media. (Isaak-Shapiro Decl. ¶ 8, ECF No. 18-1.) Isaak-Shapiro

-3-

for Peskin to increase her computer skills and social media competence. (*See* Defs.' Ex. C at PageID #856, ECF No. 18-2.) In a December 8, 2014 email, Leventhal urged Peskin to take classes in Excel, PowerPoint, and Publisher because these "major skill[s] are crucial to keep us moving forward on the marketing front by enabling you to control and manage content." (Defs.' Ex. D at PageID #857, ECF No. 18-2.) Leventhal followed up a month later, identifying a program offered through the Cleveland Public Library that met Peskin's need for "classes to be 'hands on,' rather than watching someone else." (Ex. 2D at PageID #861, ECF No. 18-2.) Yet by July 24, 2015, Peskin still did not use Excel to track her marketing budget. (*See* Ex. G at PageID #858, ECF No. 18-2 (email from Leventhal to Peskin explaining that "[t]his [budget] is a perfect example of a sheet that must — no exceptions — be converted to (ideally) Google Docs or, if you prefer, Excel"); Peskin Dep. at PageID #650, ECF No. 17-4.) Peskin eventually completed an Excel course "sometime in the fall of 2015," (Peskin Dep. at PageID #631, ECF No. 17-4), after an email from Leventhal stressing that "[w]e've been talking about this since last December; you need to act on it," (Defs.' Ex. G at PageID #858, ECF No. 18-2). But Peskin never completed courses in Publisher or PowerPoint even though she knew those skills were important to her job and Leventhal had "given [her] a directive" to learn them. (*Id.*) Likewise, Peskin did not comply with Leventhal's directives regarding social media. Although Peskin did expand her network of Facebook friends, she acknowledges that another staff member helped her accomplish that task. (*See* Peskin Dep. at PageID #639–40, 652–53, ECF

---

claims he frequently met with Leventhal to discuss these persistent issues throughout the 2014–2015 school year. (*Id.* ¶ 9; *see also* Isaak-Shapiro Dep. at PageID #149, ECF No. 17-1.) Leventhal similarly describes Peskin's failure to develop necessary skills as a chronic problem that began in 2014. (*See* Leventhal Decl. ¶¶ 7, 9–11, ECF No. 18-2.) But Peskin presents a different account. She emphasizes that she never received a negative performance evaluation before being placed on the PIP. (Peskin Decl. ¶¶ 11, 12, ECF No. 24-1.) And although Peskin concedes she had difficulty performing to the level Leventhal demanded, she says her issues stemmed entirely from her medical conditions. (*See* Peskin Dep. at PageID #693–94, ECF No. 17-4.)

No. 17-4.) Indeed, the record reveals no instance in which Peskin independently completed a social media related project without help from others, and Peskin admits she never assumed responsibility over Facebook or any other social media platform. (*See id.* at PageID #632 33, 639 40.) According to Peskin, she failed to act on Leventhal's directives because she chose to focus on "other priorities" instead. (*See* Peskin Dep. at PageID #631 33, 640, ECF No. 17-4; *see also id.* at PageID #694 ("I was well aware of what Laura expected.").)

    3. Health Issues and Requests for Accommodation

In late 2014, around the time Peskin began reporting to Leventhal, Peskin started to experience symptoms including anxiety, fatigue, and trouble concentrating. (*See id.* at PageID #668 68, ECF No. 17-4; Peskin Decl. ¶ 21, ECF No 24-1.) Peskin was diagnosed with hyperthyroidism shortly thereafter, but she did not inform anyone at Mandel JDS until sometime in 2015.[3] (*See* Peskin Dep. at PageID #623 24, 665, ECF No. 17-4.) Following the diagnosis, Peskin did not "fully understand how [her] thyroid condition affected [her]." (*Id.* at PageID #682.) On June 23, 2015, Peskin left work and went to the emergency room after experiencing chest pains. (Peskin Decl. ¶ 23, ECF No. 24-1.) While at the hospital, Peskin "learned that the heart palpitations and symptoms of fatigue and exhaustion were due to hyperthyroidism." (*Id.* ¶ 24.) Peskin subsequently received treatment on July 13, 2015, to remove her thyroid using radioactive iodine. (*Id.* ¶¶ 29, 30.) After the successful procedure, Peskin's doctor sent a letter to Defendants dated August 26, 2015, explaining that "Peskin has active hyperthyroidism with recent therapy, but will still likely not feel normal for several weeks, possibly longer." (Peskin Dep. at PageID #692, ECF No. 17-4.) And,

---

    [3]     The parties dispute when Peskin disclosed her diagnosis. Peskin does not remember precisely, but she claims it was "early in [2015], before [she] ended up in the hospital." (Peskin Dep. at PageID #624, ECF No. 17-4.) However, Leventhal asserts she did not learn of Peskin's condition until July 2015, after Peskin's hospital stay. (Leventhal Decl. ¶ 28, ECF No. 18-2.)

indeed, Peskin continued to experience fatigue and exhaustion after she returned to work. (Peskin Decl. ¶ 31, ECF No. 24-1.)

After her symptoms emerged, Peskin frequently requested more time to complete work because she needed "a very long time to do what [she] had done in a short time" in the past. (Peskin Dep. at PageID #673, ECF No. 17-4.) Importantly, Peskin admits she never "request[ed] any accommodations other than additional time to complete reports and other tasks." (*Id.* at PageID #676, ECF No. 17-4.) The parties also agree that Leventhal often granted Peskin's requests, although sometimes she reassigned tasks to other staff instead. (*See* Peskin Decl. ¶¶ 22, 33, ECF No. 24-1; Leventhal Decl. ¶ 27, ECF No. 18-2.) However, while Peskin repeatedly told Leventhal and Isaak-Shapiro that she was "not feeling herself" during this period, (*see* Leventhal Dep. at PageID #416 21, ECF No. 17-3), the parties dispute whether Peskin ever explicitly linked the need for more time to her medical condition, (*compare* Peskin Dep. at PageID #679, ECF No. 17-4, *with* Leventhal Dep. at PageID #352 53, ECF No. 17-3).

4. Termination and Replacement

On December 14, 2015, Leventhal sent a letter to Isaak-Shapiro listing various performance issues and recommending that Peskin be terminated and replaced with someone with stronger technological skills. (Pl.'s Ex. 8 at PageID #880 85, ECF No. 18-2.) Isaak-Shapiro ultimately agreed with Leventhal's recommendation and made plans to discuss the matter with Peskin in early January 2016, including an offer of three months' severance pay. (Pl.'s Ex. 10 at PageID #893 95, ECF No. 18-2.) But on January 11, 2016, before that conversation took place, Peskin submitted a request to take a 12-week medical leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.* (*See* Peskin Dep. at PageID #693, ECF No. 17-4.) The school approved Peskin's leave request, effective January 14, 2016. (Pl.'s Ex. 11 at PageID #896, ECF No. 18-2.) And rather than terminate Peskin as planned, Isaak-Shapiro decided instead to nonrenew her contract after

letting her finish the school year. (*See id.*) Isaak-Shapiro and Leventhal discussed this decision with Peskin on January 13, 2016, before she began her FMLA leave. (*Id.*) On April 15, 2016, Isaak-Shapiro sent a formal notification to Peskin confirming that Mandel JDS would not renew her contract. (Defs.' Ex. M at PageID #827, ECF No. 18-1.) Later, shortly after Peskin returned from leave in May, Isaak-Shapiro suggested "[f]or [her] health" that she should stop working and stay home while continuing "to be paid through the end of the academic year." (Defs.' Ex. N at PageID #828, ECF No. 18-1.)

Mandel JDS began advertising for the new Director of Marketing and Communications opening in the late winter and early spring of 2016. (Isaak-Shapiro Decl. ¶ 18, ECF No. 18-1.) After interviewing several candidates, Defendants hired Zachary Marcus ("Marcus"). (*Id.*) When Defendants made these personnel changes, Marcus was in his thirties and Peskin was in her late fifties. (*See* Leventhal Dep. at PageID #700, ECF No. 17-4; Compl. ¶¶ 84, 88, ECF No. 1-2.)

**B.  Procedural History**

On January 11, 2018, Peskin filed a Complaint (ECF No. 1-2) in the Cuyahoga County Court of Common Pleas, alleging state law claims under Ohio Rev. Code § 4112.02 for disability discrimination (Count I) and failure to provide reasonable accommodations (Count II); unlawful retaliation (Count III) in violation of the FMLA; and a state law claim under Ohio Rev. Code § 4112.02 for age discrimination (Count IV). Defendants removed to this court on February 12, 2018, (Not. of Removal, ECF No. 1), and filed an Answer (ECF No. 3) the next day. After conducting discovery and seeking several extensions, Defendants filed their Motion for Summary Judgment (ECF No. 18) on September 24, 2019. Peskin filed a Response in Opposition (ECF No. 24) on December 9, 2019, and Defendants filed a Reply (ECF No. 26) on January 13, 2020.

## II.  LEGAL STANDARDS

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of

production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.

If the moving party meets its burden of production, then the non-moving party must point out specific facts in the record which create a genuine issue of material fact. *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-movant must show "more than a scintilla of evidence to overcome summary judgment;" it is not enough to show that there is slight doubt as to material facts. *Zinn*, 885 F. Supp. 2d at 871 (quoting *Fulson*, 801 F. Supp. at 4). Moreover, the trial court does not have "a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 80 (6th Cir. 1989) (citation omitted)).

### III.  LAW AND ANALYSIS

**A.  Disability Discrimination**

Peskin's first claim asserts that Defendants chose not to renew her contract due to her disability, in violation of Ohio Rev. Code § 4112.02. (Compl. ¶¶ 55 68, ECF No. 1-2.) Defendants' Motion argues that Peskin fails to establish a prima facie case of disability discrimination, or, in the alternative, that she fails to adduce any evidence to establish that Defendants' proffered reason for her termination is pretext for discrimination. (*See* Mot. at PageID #773 76, ECF No. 18.) As discussed below, the court finds that Peskin's disability discrimination claim fails as a matter of law.

Pursuant to Ohio Rev. Code § 4112.02(A), it is unlawful "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Given that "Ohio's own antidiscrimination laws found in R.C.

-9-

Chapter 4112 are modeled after Title VII" of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, Ohio courts have held that "federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007); *see also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Further, with respect to disability discrimination claims in particular, courts also can look to cases interpreting the federal Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, because of its similarity to Ohio's discrimination law. *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 450 (6th Cir. 2007) (citing *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206 07 (Ohio 1998)).

When, as here, the plaintiff relies on circumstantial evidence to create an inference of discrimination, the court analyzes the claim under the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Under *McDonnell Douglas*,

> the plaintiff faces the initial burden of presenting a prima facie case of discrimination. The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. If the defendant is able to satisfy this burden, the plaintiff must then "prove that the proffered reason was actually a pretext to hide unlawful discrimination."

*Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)). But throughout this shifting, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *DiCarlo*, 358 F.3d at 415 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To establish a prima facie case of disability discrimination, a plaintiff must show that (1) she was disabled; (2) she suffered an adverse employment action, at least in part, because she was

-10-

disabled; and (3) she can safely and substantially perform the essential functions of her job despite her disability. *See Wysong*, 503 F.3d at 451. Here, Defendants acknowledge that "Peskin's hyperthyroidism may be a disability" within the meaning of § 4112.02 and that Peskin suffered an adverse employment action. (Mot. at PageID #775, ECF No. 18.) However, Defendants maintain that Peskin "cannot prove [the] required element[s] of her prima facie case" because Peskin's "medical condition was not a factor in Defendants' decision to eliminate her position and nonrenew her employment contract." (*Id.* at PageID #774 75.)

Defendants say they based their decision on longstanding issues with Peskin's job performance. (*See id.* at PageID #775, ECF No. 18.) In particular, they emphasize Peskin's failure to update her skills to keep pace with changes in the marketing field, especially with regard to digital communications and computer competency. (*See id.* at PageID #770, 774 76.) Defendants also argue that Peskin lacked any leadership presence in the school community. (*See id.*) Peskin disputes this account, arguing that "Defendants' perceived lack of work performance by Peskin was directly related to her medical condition." (Opp'n at PageID #941 42, ECF No. 24.) But while Peskin's disability may have caused her performance issues, and her poor performance resulted in the adverse employment action, it does not follow that Defendants based the adverse employment action on Peskin's disability. To the contrary, Defendants' evidence shows that (1) Peskin's performance issues began before her diagnosis and (2) Defendants continued to support Peskin and provide resources to help her improve her performance long after Defendants learned of her medical condition. Indeed, Leventhal repeatedly discussed the school's expectations, emphasized that Peskin could complete training during work hours, and explained that the school would cover the cost of classes. (*See* Peskin Dep. at PageID #630 31, 698, ECF No. 17-4.) Because the record reveals a chronic failure on Peskin's part to perform necessary job functions and a lack of evidence that Defendants terminated Peskin's position due to her disability (as opposed to her poor performance),

-11-

the court finds that Peskin cannot establish a prima facie case of disability discrimination.

In the alternative, assuming Peskin established a prima facie case, Defendants argue that Peskin's performance issues constitute a legitimate, nondiscriminatory reason to nonrenew Peskin's contract. (Mot. at PageID #775 76, ECF No. 18.) Peskin counters that Defendants' stated reasons are pretextual. (Opp'n at PageID #942 45, ECF No. 24.) To prove pretext, a plaintiff must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her termination], or (3) that they were insufficient to motivate discharge." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)). The record here contains no evidence of these indicia. Peskin's argument focuses on Leventhal's December 14, 2015 letter, recommending Peskin's termination, which Peskin asserts "is littered with inaccuracies." (Opp'n at PageID #943, ECF No. 24.) But even if the letter included some mistakes, the record shows that Leventhal honestly believed the information to be true. (*See* Leventhal Dep. at PageID #517 48, ECF No. 17-3); *see also Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017) ("[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001))). Further, Peskin's conjecture ignores the documented evidence in the record confirming her consistently poor performance over nearly a year and a half *i.e.* persistent failure to develop or maintain the technological skills necessary for her job and disregard her supervisor's directives. Based on this evidence, no reasonable jury could find that Defendants' stated reasons for terminating Peskin's employment were merely prextext for discrimination.

In short, Peskin's failure to keep pace with her field constituted a legitimate reason justifying Peskin's dismissal, and there is no evidence to support an inference of pretext. Consequently,

-12-

Defendants are entitled to summary judgment on Count I.

**B.     Failure to Provide Reasonable Accommodation**

Next, Peskin alleges that Defendants failed to provide her with a reasonable accommodation, in violation of Ohio Rev. Code § 4112.02. (Compl. ¶¶ 69 76, ECF No. 1-2.) In their Motion, Defendants argue that this "claim fails because [Peskin] is unable to demonstrate that she 'requested and was denied' reasonable accommodation." (Mot. at PageID #778, ECF No. 18.) Alternatively, Defendants maintain they are entitled to summary judgment because, even if Peskin did request an accommodation, Defendants satisfied Peskin's request by granting her more time to complete assignments. (*See* Reply at PageID #1104 06, ECF No. 26.)

As noted above, Ohio's antidiscrimination law mirrors the federal ADA in prohibiting discrimination against qualified individuals with disabilities. *See Wysong*, 503 F.3d at 450. One form of disability discrimination is the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). The Sixth Circuit has held that "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007). Because reasonable accommodation claims require direct evidence of discrimination, the *McDonnell Douglas* framework does not apply. *Id.* at 869. Instead, "[o]nce a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018).

To establish a prima facie case for a failure to accommodate claim, the plaintiff must show that: "(1) she is disabled . . . ; (2) she is otherwise qualified for the position, with or without

-13-

reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Mosby-Meachem*, 883 F.3d at 603. The dispute here chiefly concerns the third, fourth, and fifth elements.

Defendants contend that Peskin never requested an accommodation. (*See* Mot. at PageID #777 79, ECF No. 18; Reply at PageID #1104 06, ECF No. 26.) Defendants admit that Peskin requested more time to complete some of her assignments because she felt fatigued and was having trouble concentrating. (*See* Mot. at PageID #778 79, ECF No. 18.) But Defendants maintain that "[t]he duty to provide a reasonable accommodation does not arise until the plaintiff requests one," and "[a]t no time did Peskin request an 'accommodation' *due to*, or state that she was requesting additional time *because of*, her hyperthyroidism or any other medical condition." (*Id.* at PageID #779 (emphasis added).) Thus, Defendants assert that Peskin cannot establish a prima facie case because she "did not tie her request for extra time to complete some of her work to a disabling condition." (Reply at PageID #1105, ECF No. 26.) Peskin responds that "this argument is disingenuous" because the record shows that "Leventhal and Mandel JDS were keenly aware that Peskin was diagnosed with hyperthyroidism and the difficulties that Peskin had at work as a result." (Opp'n at PageID #945, ECF No. 24.)

The court agrees with Peskin that Defendants' position is untenable. Case law in the Sixth Circuit, including the cases Defendants cite for support, makes clear that an "employee is not required to use magic words such as 'accommodation' and 'disability.'" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020); (*see also* Reply at PageID #1104, ECF No. 26 (citing *Leeds v. Potter*, 249 F. App'x 442, 449 50 (6th Cir. 2007)). Instead, courts "ask whether a factfinder could infer that [the interaction] constituted a request for an accommodation." *Fisher*, 951 F.3d at 419 (quoting *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). A request suffices as long as it is

-14-

"clear from the context that it is being made in order to conform with existing medical restrictions." *Leeds*, 249 F. App'x at 449. The record here clearly establishes that Peskin notified Leventhal and Isaak-Shapiro about her hyperthyroidism diagnosis by July 2015 at the latest. (*See* Leventhal Decl. ¶ 28, ECF No. 18-2.) At that point, Defendants had actual knowledge of Peskin's disability. Moreover, Peskin's doctor sent a letter to the school dated August 26, 2015, explaining that "Peskin has active hyperthyroidism with recent therapy, but will still likely not feel normal for several weeks, possibly longer." (Peskin Dep. at PageID #692, ECF No. 17-4.) With this context, Peskin's subsequent statements about being fatigued and unable to focus obviously related to her disability, which means her requests for more time were requests for accommodation. The court therefore rejects Defendants' argument that Peskin never requested an accommodation.

Alternatively, Defendants argue that Peskin's claim fails because "it is undisputed that the only 'accommodation' that Peskin requested was additional time to complete some of her duties," which Defendants granted. (Reply at PageID #1106, ECF No. 26.) This argument is well-taken. While employers must engage with the employee in good faith "[t]o determine the appropriate reasonable accommodation," 29 C.F.R. § 1630.2(o)(3), employers are "not required to propose counter accommodations" or volunteer options that the employee never requested, *Fisher*, 951 F.3d at 421; *see also Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010); *Kleiber*, 485 F.3d at 871 72. Here, Peskin admits she never requested any accommodation besides more time to complete her work. (Peskin Dep. at PageID #676, ECF No. 17-4.) And as Peskin acknowledges, Leventhal often extended Peskin's deadlines. (*See* Peskin Decl. ¶¶ 22, 33, ECF No. 24-1.) Moreover, the record shows that Defendants offered other assistance as well: they allowed Peskin to take time off work for medical treatment and rest; Leventhal and others offered to help Peskin complete assignments, (*see* Leventhal Decl. ¶ 7, ECF No. 18-2; Leventhal Dep. at PageID #483, ECF No. 17-3); and Leventhal repeatedly asked what else the school could do to support Peskin, (*see* Ex. 2D at

PageID #861, ECF No. 18-2 (identifying computer classes tailored to Peskin's need for "hands on" instruction); Leventhal Dep. at PageID #486, ECF No. 17-3 ("What can we do to make [your job] easier?"); Defs.' Ex. F at PageID #879, ECF No. 18-2 (noting Peskin had "[n]o suggestions as to what we could do to make things smoother/faster"); Defs.' Ex. I at PageID #863, ECF No. 18-2 ("[W]e are here to help you get the ball rolling    you just need to be willing to try.")).

Despite admitting she never requested other accommodations, Peskin faults Defendants for failing to engage in an interactive process to determine what accommodation was appropriate, as required by 29 C.F.R. § 1630.2(o)(3). (Opp'n at PageID #946, ECF No. 24.) In support, Peskin cites *Kleiber*, where the Sixth Circuit acknowledged that "the interactive process that took place [] appears not to have been a model interactive process." 485 F.3d at 871; (*see also* Opp'n at PageID #946, n.163, ECF No. 24.) But the *Kleiber* panel ultimately rejected the plaintiff's argument because "[t]he record contain[ed] no suggestion that [the plaintiff] attempted to participate directly in the interactive process, and was rebuffed." *Kleiber*, 485 F.3d at 872. So too here. There is no evidence in the record that Peskin sought to initiate an interactive process with Defendants, let alone that Defendants rebuffed her. To the contrary, as discussed above, the evidence shows that Defendants took proactive steps to help Peskin develop the skills she needed to remain effective and successful in her position.

Because Peskin cannot show that she requested any accommodation that Defendants denied, she cannot establish a prima facie case of failure to accommodate. Consequently, Defendants are entitled to summary judgment on Count II.

**C.    FMLA Retaliation**

In her third claim, Peskin alleges that Defendants violated 29 U.S.C. § 2615(a) by unlawfully terminating her employment in retaliation for her utilization of medical leave under the FMLA. (Compl. ¶¶ 77 82, ECF No. 1-2.) Defendants argue that this claim fails as a matter of law because

they decided to nonrenew Peskin's contract *before* she requested FLMA leave.

To establish a FMLA retaliation claim, a plaintiff must show that

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). The familiar *McDonnell Douglas* burden-shifting framework applies to retaliation claims under the FMLA, so a plaintiff can support her allegations with indirect evidence. *Donald*, 667 F.3d at 762. But a claim cannot succeed if the only evidence of retaliation is temporal proximity between the protected activity and the adverse employment action. *Id.* at 763 (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)).

Under this framework, Peskin's claim clearly fails because the record establishes that Isaak-Shapiro made the decision to terminate Peskin *before* she requested FMLA leave. As discussed above, Leventhal sent her letter recommending Peskin's termination on December 14, 2015. (Pl.'s Ex. 8 at PageID #815, ECF No. 18-1.) Isaak-Shapiro responded on January 6, 2016, indicating that he agreed with Leventhal's assessment and planned to "offer [Peskin] a 'severance' package'" of three months' salary "based on the number of years she's worked in the school." (Pl.'s Ex. 10 at PageID #893, ECF No. 18-2.) However, on January 11, 2015, before Isaak-Shapiro could inform Peskin of this decision, Peskin submitted her request for FMLA leave, which the school promptly granted, effective January 14, 2015. (*See* Defs.' Ex. L at PageID #897, ECF No. 18-2; Peskin Dep. at PageID #693, ECF No. 17-4.) At that point, rather than follow through with the plan to terminate Peskin immediately, Isaak-Shapiro decided to let Peskin complete her contract before phasing out her position at the end of the school year. (Defs.' Ex. L at PageID #897, ECF No. 18-2.) That Isaak-

-17-

Shapiro switched the plan at the last minute does not change the fact that Isaak-Shapiro already had decided to take the allegedly retaliatory adverse employment action—*i.e.* ending Peskin's employment at Mandel JDS—*before* Peskin requested FMLA leave.

Given this undisputed sequence of events, Peskin's retaliation claim fails because she cannot prove the temporal and causal relationships necessary to establish the third and fourth elements of the prima facie case. Consequently, Defendants are entitled to summary judgment on Count III.

### D. Age Discrimination

Finally, Peskin alleges that Defendants violated Ohio Rev. Code §§ 4112.12 and 4112.99 by discriminating against her based on her age. (Compl. ¶¶ 83–92, ECF No. 1-2.) Defendants' Motion argues that Peskin's age discrimination claim fails for the same reason her disability discrimination claim fails: "her lack of [job] performance." (Mot. at PageID #782, ECF No. 18.)

The Supreme Court of Ohio has held that,

> absent direct evidence of age discrimination, in order to establish a prima facie case of a violation of R.C. 4112.14(A) in an employment discharge action, a plaintiff-employee must demonstrate that he or she (1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age.

*Coryell v. Bank One Tr. Co. N.A.*, 803 N.E.2d 781, 787 (Ohio 2004). Evaluating whether the plaintiff established a prima facie case requires largely subjective determinations, which "vests significant discretion in the trial court." *Id.* at 788. Further, because "[t]his test is a descendant of the *McDonnell Douglas*" burden-shifting framework, "the court wields yet more discretion in determining whether the employer articulated a nondiscriminatory ground for the discharge" and "whether the purpose was a pretext for discrimination." *Id.* at 785, 788.

Peskin clearly satisfies the first, second, and fourth elements: Ohio Rev. Code § 4112.14(B) protects persons "aged forty or older," which Peskin was as of January 2016; Mandel JDS

effectively terminated Peskin's employment; and Peskin was replaced by someone substantially younger. Peskin argues that she also satisfies the third element and notes that "Defendants *do not challange* [her] prima facie case." (Opp'n at PageID #949, ECF No. 24.) Of course, Defendants' argument that "Peskin clearly did not possess most skills" required for the job inherently calls into question whether Peskin was qualified to continue in her position thereby implicitly challenging the third element of Peskin's prima facie case. (Mot. at PageID #783, ECF No. 18.) But Peskin is correct that Defendants do not explicitly challenge her prima facie case. Instead, they argue Peskin "was nonrenewed for [] legitimate, nondiscriminatory reasons." (*Id.* at PageID #782.)

Assuming Peskin established a prima facie case of age discrimination, the record confirms that Defendants had legitimate, nondiscriminatory grounds for terminating her. For all the reasons discussed earlier, the court finds ample evidence to support Defendants' assertion that they nonrenewed Peskin because she failed to develop and maintain skills that were essential to her job. Further, there is no evidence that Defendants' stated justification was pretextual. While Peskin was replaced by someone, Marcus, who was significantly younger, that fact alone does not support an inference of pretext. To the contrary, the record reveals that Marcus had the digital communications and social media skills that Defendants sought. (*See* Ex. 2H at PageID #903 04, ECF No. 18-2; Leventhal Dep. at PageID #458 59, ECF No. 17-3.)

Because Defendants had legitimate, nondiscriminatory reasons to terminate Peskin's employment, and because there is no evidence to support an inference of pretext, Peskin's age discrimination claim fails. Defendants, therefore, are entitled to summary judgment on Count IV.

### IV. CONCLUSION

For the foregoing reasons, the court grants Defendants' Motion for Summary Judgment. (ECF No. 18.)

IT IS SO ORDERED.

-20-

/s/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

July 29, 2020